# CIRCUIT COURT OF THE CITY OF ROANOKE

Robert P. Boardwine

   v.

Joyce R. Bruce

May 6, 2014

Case Nos. CL12-2392, CL12-2393,
CL12-2394, and CL12-2395

BY JUDGE CHARLES N. DORSEY

This matter arises from Petitioner Robert Boardwine's petitions to establish a parent-child relationship between him and J.E.B, a three-year-old child, and to adjudicate Mr. Boardwine's custody and visitation rights.

The Court has before it Mr. Boardwine's petitions and Ms. Bruce's plea in bar. Mr. Boardwine and Ms. Bruce are each represented by counsel, and James P. Cargill, Esquire, is representing J.E.B's interests as his guardian *ad litem*. The Court heard the parties' testimony in this matter during a two-day bench trial on November 8 and 21, 2013. The parties and J.E.B. submitted post-trial briefs advocating their positions, and the Court is prepared to rule on Ms. Bruce's plea in bar and Mr. Boardwine's petitions.

For the reasons that follow, the Court finds that Mr. Boardwine is entitled to establish legal paternity and he has carried his burden of proof on that issue. Accordingly, he is J.E.B.'s legal father. The Court also grants his petitions for joint legal and physical custody and reasonable and liberal visitation.

## Facts

Respondent Joyce Bruce gave birth to J.E.B. in March 2011. Ms. Bruce became pregnant after artificially inseminating herself with Mr. Boardwine's sperm, which Mr. Boardwine had provided at Ms. Bruce's request. Although they have been friends since the 1980s, Mr. Boardwine and Ms. Bruce have never been married or in a romantic relationship with each other. Trial Tr. 46:3-11. Ms. Bruce is a single lesbian woman, and Mr. Boardwine is a gay male. *Id.* 19:18-19; 145:9-10.

Although much has been made about the parties' sexuality, their sexuality has nothing to do with the Court's decision in this matter. The applicable statutes and case law do not distinguish lesbian, gay, bisexual, transgendered, or questioning parents from any other parents, and the Court will not either. All that matters is that Mr. Boardwine provided sperm to Ms. Bruce and she became pregnant as a result.

Mr. Boardwine is currently in a long-term relationship and living with another person. *Id.* 45:16-24. Mr. Boardwine and Ms. Bruce do not intend to live together. *Id.* 46:9-11.

In January 2010, Mr. Boardwine gave Ms. Bruce his sperm because she told him that she wanted a baby. *Id.* 158:17-22. Before approaching Mr. Boardwine, Ms. Bruce had asked another friend to donate sperm. *Id.* 152:18-153:7. She had been unable to conceive after attempting at-home artificial inseminations with the other friend's sperm, and she hoped she could conceive with Mr. Boardwine's sperm. *Id.* 152:18-153:23; 158:23-159:6. Ms. Bruce proposed that Mr. Boardwine give her his sperm so she could inseminate herself with a turkey baster. *Id.* 96:5-10.

Mr. Boardwine agreed, and, in January 2010, he went to Ms. Bruce's house, deposited his sperm in a plastic container, and left it for Ms. Bruce. *Id.* 65:14-66:4; 94:24-96:10. Ms. Bruce took the sperm and inseminated herself with a turkey baster. *Id.* 96:5-10. Ms. Bruce did not become pregnant from this attempt. *Id.* 163:15-19.

Because Ms. Bruce failed to conceive, she consulted a fertility specialist. *Id.* 163:22-164:21. The doctor attempted two artificial inseminations in April and May 2010 with sperm from anonymous donors, but these inseminations also failed. *Id.* 164:13-21.

After her efforts with the fertility doctor failed, Ms. Bruce asked Mr. Boardwine to donate sperm again. *Id.* 166:10-23. He agreed, and, in June 2010, he went to Ms. Bruce's house on three consecutive nights to donate sperm. *Id.* 167:2-8. Ms. Bruce tried her at-home insemination method again, and, as a result of these inseminations, Ms. Bruce became pregnant. *Id.* 167:22-23. There is no dispute that J.E.B. is Mr. Boardwine's and Ms. Bruce's biological child. Both parties agree on this fact, *id.* 193:9-12, and a DNA test conducted pursuant to Va. Code § 20-49.3 affirms this.

Ms. Bruce had approached Mr. Boardwine and asked for his sperm prior to her 2010 attempts. In 1999, while Ms. Bruce was in a committed

relationship, Ms. Bruce and her partner asked Mr. Boardwine to donate sperm so the couple could have a baby. *Id.* 16:20-17:6. Mr. Boardwine declined. If he was going to give sperm, Mr. Boardwine wanted to be involved as the child's father, and, at that time, he believed he was not ready for that responsibility. *Id.* 51:21-52:19. Ultimately, Ms. Bruce and her partner found a college student to donate sperm, and Ms. Bruce's partner became pregnant. *Id.* 148:3-12. Ms. Bruce parented that child until her relationship with her partner ended. *Id.* 148:19-149:11.

Similarly, when Mr. Boardwine gave his sperm in 2010, he expected to be involved as the child's father. *Id.* 19:9-11. Although the parties discussed a written agreement outlining Mr. Boardwine's parental rights, they never made one. *Id.* 161:4-12; 162:23-163:2; 167:9-18. Before he provided his sperm, however, Mr. Boardwine believed that he and Ms. Bruce understood and agreed he would have rights as J.E.B's father. *Id.* 19:3-11; 20:12-18.

Ms. Bruce and Mr. Boardwine had a falling out in October 2010 because they disagreed about the child's name. *Id.* 170:11-172:19. Because of this, they had little contact from October 2010 until J.E.B.'s birth. *Id.* 171:6-173:11.

Ms. Bruce denies that she wanted Mr. Boardwine to have parental rights. Instead, Ms. Bruce claims that she only agreed to allow Mr. Boardwine to have informal contact with J.E.B. *Id.* 173:12-174:14. She claims that she never wanted Mr. Boardwine to have formal custody or visitation rights. *Id.* 174:11-14. According to her, the written agreement she discussed with Mr. Boardwine would have waived Mr. Boardwine's parental rights and responsibilities. *Id.* 161:5-12.

The Court discusses the agreement throughout this letter opinion only to illuminate the parties' intent regarding whether Mr. Boardwine was to be able to parent J.E.B. It is clear that absent statutory authorization, any private agreement between biological parents purporting to waive one parent's rights and responsibilities to parent and support a biological child would be unenforceable in this Commonwealth. *See Kelley v. Kelley,* 248 Va. 295, 298, 449 S.E.2d 55, 56 (1994) (holding that parents cannot contract away rights that each parent owes to the child). The agreement that Ms. Bruce describes in this case would have lacked statutory authorization, and it would have been unenforceable.

Mr. Boardwine seeks a determination of paternity. He also asks for joint legal and physical custody and reasonable and liberal visitation. Ms. Bruce has pleaded a plea in bar to Mr. Boardwine's petitions, arguing that Va. Code § 20-158(A)(3) prevents Mr. Boardwine from acquiring any parental rights.

*Issues*

To resolve Ms. Bruce's plea in bar and Mr. Boardwine's petitions, the Court must address four issues:

1. Paternity is generally determined under Va. Code § 20-49.1. Ms. Bruce argues that Va. Code § 20-158, which only applies to children born from a Va. Code § 20-156 "assisted conception," bars Mr. Boardwine from obtaining parental rights under Va. Code § 20-49.1. J.E.B., however, asserts that his birth was not the result of an "assisted conception," and thus, Va. Code § 20-158 does not apply. Was J.E.B.'s birth the result of a Va. Code § 20-156 "assisted conception," and does Va. Code § 20-158 apply?

2. Virginia Code § 20-158(A)(3) states that a Va. Code § 20-156 "donor" is not a parent if the "donor" is not the gestational mother's husband. Mr. Boardwine was never Ms. Bruce's husband. If Va. Code § 20-158 applies, does subsection (A)(3) prohibit Mr. Boardwine from acquiring parental rights?

3. Mr. Boardwine asserts that he is J.E.B.'s legal father. If Va. Code § 20-158(A)(3) applies and if it does not prohibit him from acquiring parental rights, Mr. Boardwine must establish parentage with clear and convincing evidence. It is undisputed that Mr. Boardwine is J.E.B.'s biological father, and the parties presented evidence of whether Mr. Boardwine and Ms. Bruce intended for Mr. Boardwine to be J.E.B.'s legal father. Has Mr. Boardwine met this burden?

4. Finally, if Mr. Boardwine can establish paternity, the Court must determine Mr. Boardwine's custody and visitation rights according to J.E.B.'s best interests. What custody and visitation arrangement is in J.E.B.'s best interests?

The Court will address each of these issues in turn.

*Analysis*

Ms. Bruce asserts that Va. Code § 20-158(A)(3) prohibits Mr. Boardwine from being J.E.B.'s legal father. She bears the burden of proof on this issue. *Baker v. Poolservice Co.*, 272 Va. 677, 688, 636 S.E.2d 360, 366 (2006).

J.E.B. argues, however, that Va. Code § 20-158(A)(3) does not apply. If Va. Code § 20-158 does not apply, Mr. Boardwine must establish paternity under Va. Code § 20-49.1. But Mr. Boardwine asserts that, even if Va. Code § 20-158(A)(3) does apply, it does not prohibit him from acquiring parental rights.

If Va. Code § 20-158(A)(3) applies but does not prohibit Mr. Boardwine from acquiring parental rights, he bears the burden of proving paternity with clear and convincing evidence. Va. Code § 20-49.4.

If Mr. Boardwine establishes paternity, the Court must determine J.E.B.'s custody and visitation according to J.E.B.'s best interests. *Id.* § 20-124.3. This determination requires the Court to apply Va. Code § 20-124.3's statutory factors.

## A. *Virginia Code § 20-158 Does Not Apply*

First, the Court must address J.E.B.'s assertion that Va. Code § 20-158(A)(3) does not apply to Mr. Boardwine. Virginia Code § 20-158 governs the parentage of children born from "assisted conception." *Id.* § 20-158(A)(3). According to subsection (A)(3), a "donor is not the parent of a child conceived through assisted conception, unless the donor is the husband of the gestational mother." *Id.*

J.E.B. argues that, according to the statute, subsection (A)(3)'s prohibition applies only to children "conceived through assisted conception." According to him, he was not "conceived through assisted conception," and subsection (A)(3)'s prohibition does not apply.

"Assisted conception" is:

> a pregnancy resulting from any intervening medical technology, whether in vivo or in vitro, which completely or partially replaces sexual intercourse as the means of conception. Such intervening medical technology includes, but is not limited to, conventional medical and surgical treatment as well as noncoital reproductive technology such as artificial insemination by donor, cryopreservation of gametes and embryos, in vitro fertilization, uterine embryo lavage, embryo transfer, gamete intrafallopian tube transfer, and low tubal ovum transfer.

*Id.* § 20-156.

J.E.B. argues that "intervening medical technology," as the term is used to define "assisted conception," means that his conception must have involved a physician's intervention. J.E.B. reasons that Ms. Bruce's at-home insemination with a turkey baster was not an "intervening medical technology" because it did not involve a physician's assistance.

Virginia Code § 20-156 provides an inclusive definition of "intervening medical technology." According to Va. Code § 20-156, "intervening medical technology includes, but is not limited to, conventional medical and surgical treatment as well as noncoital reproductive technology." *Id.* Thus, "intervening medical technology" includes, but is not limited to, "conventional medical and surgical treatment" and "noncoital reproductive technology." *Id.*

The phrase "conventional medical and surgical treatment" certainly contemplates a physician's involvement. The statute identifies procedures that are noncoital reproductive technologies, and some of these are defined. None of the defined noncoital reproductive technologies, "cryopreservation of gametes and embryos"; "in vitro fertilization"; and "embryo transfer," applies here.

The undefined terms, "artificial insemination," "uterine embryo lavage," "gamete intrafallopian tube transfer," and "low tubal ovum transfer," are not defined elsewhere in the Code. It is clear, however, that J.E.B. was not conceived by "uterine embryo lavage." In "uterine embryo lavage" a viable embryo is fertilized in a fertile woman, flushed out by a physician before implantation, and then implanted into an infertile woman. J. Kenyon Mason & Graeme T. Laurie, *Mason & McCall Smith's Law & Medical Ethics*, 296 (9th ed. 2013). That did not happen here.

Similarly, J.E.B. was not conceived from a "gamete intrafallopian tube transfer." According to *Taber's Cyclopedic Medical Dictionary*, "gamete intrafallopian tube transfer" is performed by inducing ovulation, and "[a]fter ovulation is induced, ova are retrieved from a mature follicle via laparoscopy and are transferred along with sperm to the woman's fallopian tube to facilitate fertilization." *Id.*, "Gamete intrafallopian transfer." Laparoscopy, a surgical procedure, certainly requires a physician's assistance. *Id.*, "Laparoscopy" ("Abdominal exploration with an endoscope."); *id.*, "Endoscope" ("A device consisting of a tube and optical system for observing the inside of a hollow organ, cavity, or tissue plane. This observation may be done through a natural body opening or a small incision."). Thus, "gamete intrafallopian tube transfer" does not apply here. Similarly, J.E.B.'s conception did not result from a "low tubal ovum transfer." "Low tubal ovum transfer" also requires surgery and a physician's assistance. Mimi C. Berman & Harris L. Cohen, *Obstetrics and Gynecology*, 566 (2d ed. 1997).

*Taber's* defines "artificial insemination," however, as "[m]echanical placement of semen containing viable spermatozoa into the vagina." *Taber's Cyclopedic Medical Dictionary*, "Artificial Insemination" (21st ed. 2011). The definition does not mention whether the placement must be done by a doctor. The question, however, is not whether *Taber's* definition requires a physician, but whether "artificial insemination," understood in the context of Va. Code §§ 20-156 and 20-158, requires a physician's assistance.

All of the other procedures identified as intervening medical technologies require a physician's assistance. Under the associated-words canon of statutory construction, associated words bear on one another's meaning. *TravCo Ins. Co. v. Ward*, 284 Va. 547, 554, n. 2, 736 S.E.2d 321, 325, n. 2 (2012) ("The maxim of *noscitur a sociis* provides that the meaning of doubtful words in a statute may be determined by reference to their association with related words and phrases."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 195-98 (2012). Here, because all of the other listed intervening medical technologies require a physician's assistance, the Court concludes that, in the context of this case, "artificial insemination" requires a physician's involvement.

The Court must construe statutes so that they make sense. *United States v. Granderson*, 511 U.S. 39, 47, n. 5, 114 S. Ct. 1259, 127 L. Ed. 2d 611 (1994). Accordingly, the meaning of a statute's words must be limited

224

to avoid an absurd result. *States v. Kirby*, 74 U.S. (7 Wall.) 482, 486, 19 L. Ed. 278 (1869) (noting that terms in a statute "should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence"). It is difficult to believe that the General Assembly intended that the use of a turkey baster in the privacy of one's home and without a physician's assistance would trigger all of the substantive provisions of the Assisted Conception Act.

Under these facts, Ms. Bruce's pregnancy did not result from an "intervening medical technology." J.E.B. was conceived through an at-home turkey baster insemination. No physician was involved. Thus, the pregnancy did not result from "artificial insemination" or any other "intervening medical technology." Accordingly, J.E.B. was not "conceived through assisted conception" under Va. Code §§ 20-156 and 20-158, and Va. Code § 20-158(A)(3) does not apply.

Because Va. Code § 20-158(A)(3) does not apply, paternity is determined by Va. Code § 20-49.1. Under Va. Code § 20-49.1(B)(1), paternity may be established with a scientifically reliable genetic test indicating a 98% probability of paternity. The genetic testing in this case indicates that there is a 99.9% probability that Mr. Boardwine is J.E.B.'s genetic father, a fact that is also undisputed. Accordingly, Mr. Boardwine is J.E.B.'s legal father.

B. *In the Alternative, Even If Va. Code § 20-158(A)(3) Applied, It Would Not Prevent Mr. Boardwine from Acquiring Parental Rights*

The Court has found that Va. Code § 20-158(A)(3) does not apply to these facts. But even if Va. Code § 20-158(A)(3) did apply, it would not prevent Mr. Boardwine from acquiring parental rights.

Mr. Boardwine would have been a "donor" under Va. Code § 20-158(A)(3). Va. Code § 20-156. A "donor is not the parent of a child conceived through assisted conception, unless the donor is the husband of the gestational mother." Va. Code § 20-158(A)(3). Again, Mr. Boardwine was never Ms. Bruce's husband. Thus, reading Va. Code § 20-158(A)(3) in isolation, it appears that subsection (A)(3) would have prohibited Mr. Boardwine from being J.E.B.'s legal father.

1. *The Court Must Harmonize Va. Code § 20-158(A)(3) with Title 20, Chapter 3.1*

Virginia Code § 20-158(A)(3), however, cannot be read in isolation. Virginia Code § 20-158(A)(3) is only a single piece of a complex statutory scheme, and it must be read in conjunction and harmonized with Title 20, Chapter 3.1 (Va. Code § 20-49.1 et seq.). *L.F. v. Breit*, 285 Va. 163, 176, 736 S.E.2d 711, 718 (2013).

a. *Virginia Code § 20-49.1(B)(2) Does Not Conflict with Va. Code § 20-158(A)(3)*

Virginia Code § 20-49.1(B) creates two statutory presumptions that an individual can use to establish parentage. First, subsection (B)(1) presumes that any male with "at least a ninety-eight percent probability of paternity," as established by "scientifically reliable genetic tests," is a child's legal father. Va. Code § 20-49.1(B)(1). Second, subsection (B)(2) presumes that a father is a child's legal father when the father and mother swear in a written statement that the father is the child's legal father. *Id.* § 20-49.1(B)(2).

*L.F. v. Breit*, 285 Va. 163, 736 S.E.2d 711 (2013), held that a biological father can establish paternity with a Va. Code § (B)(2) written affirmation despite Va. Code § 20-158(A)(3)'s presumption that an unmarried sperm donor is not a parent. Id. at 179-80, 736 S.E.2d at 720. Mr. Breit and the child's mother lived together in a long-term relationship as an unmarried couple. Id., at 171, 736 S.E.2d at 715. When Breit and the mother could not conceive naturally, Breit provided sperm and the mother became pregnant after two cycles of doctor-assisted in vitro fertilization. Prior to the child's birth, the mother and Breit entered into a written custody-and-visitation agreement, agreeing that Breit should have reasonable visitation. A day after the child's birth, Breit and the mother affirmed Breit's paternity in a sworn written agreement. Id.

Breit and the mother separated four months after the child's birth, and Breit continued to parent the child until the mother unilaterally ended his contact with the child. *Id.* at 171-72, 736 S.E.2d at 715. Breit then petitioned for a determination of parentage and custody and visitation. *Id.* at 172, 736 S.E.2d at 716.

The Circuit Court dismissed Breit's petitions, holding that despite the parties' Va. Code § 20-49.1(B)(2) acknowledgement of paternity, Va. Code § 20-158(A)(3) prohibited Breit from acquiring parental rights. The Court of Appeals reversed the Circuit Court's decision, and the Supreme Court of Virginia granted the mother's appeal. *Id.*

The Court affirmed the Court of Appeal's decision. According to *Breit*, Va. Code § 20-158 must be harmonized with Title 20, Chapter 3.1. *Id.* at 178, 736 S.E.2d at 719. When read with Va. Code § 20-49.1(B)(2), Va. Code § 20-158(A)(3) does not prevent an unmarried sperm donor from establishing paternity. *Id.* at 179-80, 736 S.E.2d at 720. Virginia Code § 20-158 was enacted "specifically to protect the interests of married parents," *id.* at 175, 736 S.E.2d at 717, by preventing third-party sperm donors from asserting parentage claims against infertile married couples. *Id.* at 179-80, 736 S.E.2d at 720. It should not be read to "divest individuals of the ability to establish parentage solely due to marital status." *Id.* Harmonizing Va. Code § 20-158(A)(3) with Va. Code § 20-49.1(B)(2), the Court concluded that Va. Code § 20-158(A)(3) does not prevent an unmarried donor from establishing paternity with a Va. Code § 20-49.1(B)(2) written acknowledgement. *Id.*

### b. *When Harmonized with Title 20, Chapter 3.1, Va. Code § 20-158(A)(3) Does Not Prevent an Unmarried Sperm Donor from Establishing Paternity without a Written Acknowledgement*

Although Va. Code § 20-49.1(B)(2) can be harmonized with Va. Code § 20-158(A)(3), Ms. Bruce asserts that Va. Code § 20-49.1(B)(1) cannot. It is true that *Breit* noted in dicta that Va. Code § 20-49.1(B)(1) and Va. Code § 20-158(A)(3) directly conflict. *Id.* at 179, 736 S.E.2d at 719. The Court noted that "a sperm donor aided only by the results of genetic testing may not establish parentage." *Id.* Because Mr. Boardwine does not have a Va. Code § 20-49.1(B)(2) written acknowledgement and because he cannot rely on Va. Code § 20-49.1(B)(1) alone, Ms. Bruce asserts that he cannot establish paternity.

Virginia Code § 20-158(A)(3), however, must be harmonized with all of Title 20, Chapter 3.1. *Id.* at 176, 736 S.E.2d at 718. And when the Court harmonizes statutes that create or terminate parent-child relationships, it must interpret them "consistently with the governmental objective of preserving, when possible, the parent-child relationship." *Id.* at 185, 736 S.E.2d at 723.

Generally, if Virginia Code § 20-49.1(B)'s presumptions do not apply, paternity can be established according to Virginia Code § 20-49.4 with any clear and convincing evidence. Va. Code § 20-49.1(B)(3). The Court cannot ignore Va. Code § 20-49.4. Because Mr. Boardwine cannot rely on Va. Code § 20-49.1(B)'s presumptions and because the Court must harmonize Va. Code § 20-158 with all of Title 20, Chapter 3.1, the Court must harmonize Va. Code § 20-49.4 with Va. Code § 20-158. *Breit*, 285 Va. at 178, 736 S.E.2d at 719.

Virginia Code § 20-158(A)(3) can be harmonized with Va. Code § 20-49.4. Virginia Code § 20-49.4 states that a father can establish paternity with any clear and convincing evidence. Although Va. Code § 20-158(A)(3) creates a presumption that an unmarried sperm donor cannot be a parent, it is only a presumption, not an absolute prohibition, because it cannot overcome a Va. Code § 20-49.1(B)(2) written acknowledgment. Neither can it overcome clear and convincing evidence, beyond mere genetics, that two unmarried biological parents intended the sperm donor to be a legal parent of their biological child.

Thus, according to Va. Code § 20-49.4, an unmarried sperm donor can establish parentage despite Va. Code § 20-158(A)(3)'s presumption that the donor is not a parent. An unmarried donor can establish legal paternity by demonstrating that the parties intended for him to be the child's legal father.

This harmonization is consistent with Va. Code § 20-158's purpose and the Supreme Court's mandate that this Court read statutes creating or terminating parent-child relationships "consistently with the governmental objective of preserving, when possible, the parent-child relationship." *Id.* at 185, 736 S.E.2d at 723. Virginia Code § 20-158(A)(3) makes clear

that biology alone is not enough to determine the paternity of a child born from an assisted conception. Again, this proscription specifically seeks to prevent third-party donors from asserting parental rights over a child born to an infertile married couple. *Id.* at 179-80, 736 S.E.2d at 720. Thus, Va. Code § 20-158(A)(3) cancels out Va. Code § 20-49.1(B)(1)'s genetic presumption because the presumption is inconsistent with this purpose. A sperm donor cannot prove paternity "aided only by the results of genetic testing." *Id.* at 179, 736 S.E.2d at 719.

But, by harmonizing Title 20, Chapter 3.1, and Va. Code § 20-158(A)(3) in a way that allows a sperm donor lacking a written acknowledgement to prove with other clear and convincing evidence that the parties intended for him to be a legal parent, the Court adheres to Va. Code § 20-158's aim and protects the father's and child's liberty interests in maintaining a parent-child relationship. This harmonization allows an intended father to prove that the parties intended him to be a legal parent. In addition, it prevents a mere sperm donor from inserting himself into a married couple's relationship with their child. Thus, according to Va. Code § 20-158(A)(3), if a putative father has nothing more than mere biology to support his claim, he cannot establish legal paternity. But this proscription can be overcome under Va. Code § 20-49.4 if a putative father, lacking a written acknowledgement, can establish with clear and convincing evidence that the parties intended for him to be the legal father.

Thus, Va. Code § 20-158(A)(3) does not prevent Mr. Boardwine from proving he is an intended parent under Va. Code § 20-49.4. His biology alone, however, is insufficient to carry his burden. Va. Code § 20-158(A)(3).

## 2. *The Parties Intended for Mr. Boardwine to be J.E.B.'s Legal Father*

Because Va. Code § 20-158(A)(3) does not prevent Mr. Boardwine from establishing that he is J.E.B.'s legal father and because he cannot rely on Va. Code § 20-49.1(B)'s presumptions, he must prove that he and Ms. Bruce intended for him to be J.E.B.'s legal father. He must meet this burden with clear and convincing evidence. Va. Code § 20-49.4.

Clear and convincing evidence is:

> that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases. It does not mean clear and unequivocal.

*Judicial Inq. & Rev. Comm'n v. Lewis*, 264 Va. 401, 405, 568 S.E.2d 687, 689 (2002) (citations omitted).

Based on the evidence, the Court has no doubt that Mr. Boardwine always intended to be J.E.B.'s legal father. He expected to be involved as a father, and he would not have provided his sperm otherwise. Trial Tr. 20:16-18. Thus, the question is whether Ms. Bruce also intended for Mr. Boardwine to be J.E.B.'s legal father.

Ms. Bruce and Mr. Boardwine discussed Mr. Boardwine's role as a parent and sperm donor on many occasions before and during her pregnancy. They initially discussed his role in January 2010 when she asked him to donate his sperm. Ms. Bruce claims that, during their initial discussion, she told Mr. Boardwine that they needed a written contract. At that time, she knew Mr. Boardwine wanted to be involved in the child's life, just as he did in 1999 when she and her partner first approached him for his sperm. *Id.* 159:7-16. In 1999, Mr. Boardwine declined to donate sperm because he wanted to be involved as the child's father and he was not ready for that responsibility. *Id.* 52:14-19. Ms. Bruce claims, however, that she intended to be the child's sole parent and that she was willing to allow Mr. Boardwine to have informal visitation and involvement with the child. *Id.* 159:7-23.

It is unclear how detailed the parties' discussion of a written agreement was at that time. The Court does not know whether Ms. Bruce merely mentioned that a written agreement would be needed or whether she informed him that she wanted him to sign a written agreement disavowing his parental rights.

Soon after this discussion, Mr. Boardwine provided sperm and Ms. Bruce brought up the written agreement again. Ms. Bruce claims that, on the first day Mr. Boardwine provided sperm, she had an agreement ready for him to sign. According to her, this agreement would have cut off Mr. Boardwine's parental rights. Although she asked Mr. Boardwine to sign the agreement, he declined. She did not show him the document, insist that he sign it, or discuss its terms. Ultimately, Mr. Boardwine provided sperm that night without signing an agreement. *Id.* 161:4-19.

Again, this first insemination did not result in a pregnancy. And when Ms. Bruce asked Mr. Boardwine in June 2010 to donate again, she did not mention a written agreement or insist that Mr. Boardwine sign one. *Id.* 167:2-18.

The parties discussed a written agreement one more time. During Ms. Bruce's pregnancy, she went to dinner with Mr. Boardwine, and they discussed whether they needed a written agreement; because they trusted each other, they decided that they did not. *Id.* 101:12-22; 167:13-18.

Given Ms. Bruce's history and her knowledge of Mr. Boardwine's intent to parent the child, the Court believes Ms. Bruce would have insisted on a written agreement releasing Mr. Boardwine's parental rights if she did not want him to parent J.E.B. Ms. Bruce knew that written agreements are important to protecting parties' rights. Trial Tr. 186:14-19. When she and her partner sought a donor in 1999, they insisted on a written agreement.

*Id.* 185:17-24. And when Ms. Bruce approached another friend for sperm in 2009, that friend signed a written agreement before he donated. *Id.* 132:16-24; 153:21-23. In addition, Ms. Bruce had experienced tremendous loss in the past when her partner took their child away. *Id.* 150:7-16.

Having experienced this loss, Ms. Bruce was unwilling to become a foster parent because she was afraid that any child that she cared for would leave her. *Id.* 151:7-20. Finally, Ms. Bruce knew that Mr. Boardwine wanted to parent the child. *Id.* 159:10-16. Because Ms. Bruce knew this, the importance of contracts, and the pain of losing a child, if Ms. Bruce wanted to ensure that she was the sole parent and that Mr. Boardwine had no parental rights, she would have insisted that Mr. Boardwine sign a written agreement waiving his rights and responsibilities to parent J.E.B. and protecting hers. Again, this agreement would have been unenforceable. *See supra.*

In addition, the uncontradicted evidence of Ms. Bruce's July 7, 2010, phone call to Mr. Boardwine suggests that the parties intended for Mr. Boardwine to parent the child. On July 7, 2010, Ms. Bruce found out she was pregnant, and she called Mr. Boardwine and told him the good news. Trial Tr. 21:17-23. Mr. Boardwine testified that Ms. Bruce stated, "We are pregnant," and that the pregnancy was Mr. Boardwine's "birthday present." *Id.* 21:17-22:12. Although Ms. Bruce does not remember whether she said "we are pregnant," she does remember making the call and being excited to share the news. *Id.* 190:1-4. Following Ms. Bruce's phone call, Mr. Boardwine stopped by her house with an infant jumpsuit and a stuffed bear, and they celebrated the good news. *Id.* 190:8-10.

That same day, the parties began discussing names for the child. *Id.* 22:21-23. Mr. Boardwine claims Ms. Bruce promised him that he could name the child. *Id.* 23:10-15. Ms. Bruce, however, claims that Mr. Boardwine asked to name the child, and she told him she would think about it. Although their accounts differ, Ms. Bruce admitted that she did consider allowing Mr. Boardwine to name the child. *Id.* 189:7-17. Eventually, naming the baby became contentious, and the parties had a falling out. *Id.* 170:11-172:19.

Before the parties became antagonistic over naming the baby, Ms. Bruce invited Mr. Boardwine to an ultrasound appointment. *Id.* 40:22-41:3. She wanted him to be there to learn the baby's sex. *Id.* 169:11-23. When they learned the baby's sex, Ms. Bruce kissed Mr. Boardwine on the hand. *Id.* 41:10-12.

Considering Ms. Bruce's actions before and during the pregnancy, the Court finds that Ms. Bruce intended for Mr. Boardwine to be J.E.B.'s legal father. Although she had made agreements cutting off donors' parental rights in the past, Ms. Bruce did not insist that Mr. Boardwine sign one. She did not insist even though she knew that Mr. Boardwine wanted to parent the child. And each time that she had insisted on agreements in the past, the agreements also protected the donor from paternity claims. The college

student who donated sperm to Ms. Bruce and her partner in 1999 did not want to be a father. *Id.* 186:14-23. Similarly, the other friend she approached did not want to be a father to Ms. Bruce's child either. *Id.* 188:12-189:6.

In addition, after Ms. Bruce found out that she was pregnant, she called Mr. Boardwine and told him that *they,* collectively, were pregnant. She considered her pregnancy to be Mr. Boardwine's birthday present. Ms. Bruce even considered allowing Mr. Boardwine to name the child. Finally, when preparing for an important ultrasound, Ms. Bruce made sure to invite Mr. Boardwine. When they learned the baby's sex, she kissed his hand.

The Court finds that when Mr. Boardwine provided his sperm, both he and Mrs. Bruce intended for him to be J.E.B.'s legal father. When the parties argued about J.E.B.'s name, Ms. Bruce had second thoughts. Although she was aware Mr. Boardwine wanted to parent the child and she acted accordingly until their falling out, Ms. Bruce now claims that she never wanted Mr. Boardwine to parent J.E.B. Her actions before the falling out, however, belie that intent.

Because Mr. Boardwine has proved that the parties intended for him to be J.E.B.'s parent, he has proved that he is J.E.B.'s legal father. Thus, even if Va. Code § 20-158 applied, the Court's conclusion would be the same: Mr. Boardwine is entitled to parental rights.

C. *Mr. Boardwine Is Entitled to Joint Legal and Physical Custody and Reasonable and Liberal Visitation*

Mr. Boardwine asks the Court to award him joint legal and physical custody of J.E.B. He believes Ms. Bruce should continue to have primary physical custody of J.E.B., so he also asks for reasonable and liberal visitation. Mr. Boardwine's requests are in J.E.B.'s best interests.

To adjudicate custody and visitation, this Court must apply Va. Code § 20-124.3's ten factors to determine what arrangements are in J.E.B.'s best interests.

First, the Court must consider J.E.B.'s age and physical and mental condition. This factor must be considered in light of J.E.B.'s changing developmental needs. Va. Code § 20-124.3(1). Nothing indicates that J.E.B. is anything but a healthy and happy three-year-old child. Ms. Bruce indicates that he is ahead of schedule on most of his developmental milestones. Trial Tr. 184:17-22.

Next, the Court must consider the age and physical and mental condition of each parent. Va. Code § 20-124.3(2). Mr. Boardwine is 41 years old, and he works at Valley Podiatry. Trial Tr. 96:19-22. Nothing indicates that he is anything but physically and mentally healthy. Ms. Bruce is a 42-year-old special-education teacher. *Id.* 144:16-18; 145:6-7. Nothing indicates that she is anything but physically and mentally healthy.

The Court must also consider each parent's relationship with J.E.B., including each parent's positive involvement in J.E.B.'s life and ability

to assess and meet J.E.B.'s emotional, intellectual, and physical needs. Va. Code § 20-124.3(3). Mr. Boardwine has been positively involved in J.E.B.'s life. He has visited J.E.B. at Ms. Bruce's house several times, and, on at least two occasions, he brought his family to visit with J.E.B. Trial Tr. 178:9-180:3. During his visits, Mr. Boardwine plays and interacts appropriately with J.E.B. *Id.* 208:12-22. Mr. Boardwine has also brought J.E.B. gifts and diapers. *Id.* 207:16-20.

Similarly, Ms. Bruce has been positively involved in J.E.B.'s life, parenting him in her home since his birth. *Id.* 144:3-7. No one disputes that she is a wonderful mother. Ms. Bruce also has a master's degree in special education, making her well-equipped to handle J.E.B.'s emotional, intellectual, and physical needs. *Id.* 145:3-5.

Next, the Court must consider J.E.B.'s needs, giving due consideration to other important relationships in J.E.B.'s life. Va. Code § 20-124.3(4). J.E.B. needs what every child needs, the love and support of his family. Nothing indicates the J.E.B. has any special needs. Both parties live locally; so visitation with Mr. Boardwine would not take J.E.B. far from Ms. Bruce. Trial Tr. 16:6-7; 143:19-20. Because Mr. Boardwine's family also lives locally, Mr. Boardwine has attempted to foster a relationship between his family and J.E.B. It is unclear how involved Ms. Bruce's family is in J.E.B.'s life.

The Court must also consider each parent's role in J.E.B.'s upbringing and care. Va. Code § 20-124.3(5). Ms. Bruce is J.E.B.'s primary caregiver, and Mr. Boardwine has never visited J.E.B. outside of Ms. Bruce's presence. Trial Tr. 83:22-24. Mr. Boardwine wants Ms. Bruce to continue as J.E.B.'s primary caregiver. *Id.* 37:8-11. Ms. Bruce provides for J.E.B. financially, and, although Mr. Boardwine has not contributed to J.E.B.'s care financially, Ms. Bruce has not asked for financial support and she would have refused it had Mr. Boardwine offered. *Id.* 160:14-18; 207:24-208:3. Mr. Boardwine, however, has brought J.E.B. diapers and gifts, and, as J.E.B.'s legal father, Mr. Boardwine will be responsible for his share of J.E.B.'s financial support.

Next, the Court must consider each parent's propensity to actively support J.E.B.'s relationship with the other parent. Va. Code § 20-124.3(6). Mr. Boardwine believes it is in J.E.B.'s best interests for Ms. Bruce to continue as J.E.B.'s primary caregiver. Accordingly, he is not asking for primary physical custody. The Court believes that he is willing to foster J.E.B's relationship with Ms. Bruce the best he can. Given the nature of this dispute, however, the Court is concerned about whether Ms. Bruce is willing to actively foster J.E.B.'s relationship with Mr. Boardwine. Although the parties get along well when Mr. Boardwine visits J.E.B. at Ms. Bruce's house, she does not want Mr. Boardwine to parent J.E.B. Trial Tr. 99:17-24; 208:9-14.

In addition, the Court must consider each parent's relative willingness and demonstrated ability to maintain a close and continuing relationship with J.E.B. Va. Code § 20-124.3(7). As part of this consideration, the Court must also consider each parent's ability to cooperate in and resolve disputes regarding matters affecting J.E.B. *Id.* Each parent is willing and able to maintain a close and continuing relationship with J.E.B. Ms. Bruce has parented J.E.B. on her own for three years, and she wishes to continue to do so. Mr. Boardwine has maintained a relationship with J.E.B., visiting him at Ms. Bruce's house when he could. Mr. Boardwine wishes to become more involved in J.E.B.'s life.

The Court is concerned about how well the parents will cooperate in and resolve disputes regarding matters affecting J.E.B. When the parties argued about naming J.E.B., their relationship crumbled, and they communicated only by telephone and email. Trial Tr. 170:11-174:17. Although Mr. Boardwine expressed a willingness to meet and discuss their disagreement, Ms. Bruce resisted or ignored his efforts. *Id.* 172:3-5; 174:15-17. When Ms. Bruce would not engage with him, Mr. Boardwine became confrontational and lashed out at her on the phone, telling Ms. Bruce that he would refuse to call the child the name Ms. Bruce chose. *Id.* 172:12-17. Other than small talk during Mr. Boardwine's visits with J.E.B., the parties are not communicating. *Id.* 182:2-183:3.

Next, the Court must consider J.E.B.'s reasonable preference if it determines that J.E.B. is able to form one intelligently. Va. Code § 20-124.3(8). Given that J.E.B. is only three years old, he is not able to form an intelligent preference about his custody and visitation.

In addition, the Court must consider any history of family abuse, but there is no family-abuse history here. *Id.* § 20-124.3(9).

Finally, the Court must consider any other factors it deems necessary and proper to its determination. *Id.* § 20-124.3(10). Because Mr. Boardwine asks for overnight visitation, the Court will consider his living arrangements. Mr. Boardwine lives with his partner in a three-bedroom home. Trial Tr. 98:5-6. His partner has visitation rights with his two children every weekend, so the children stay with their father and Mr. Boardwine on weekends. *Id.* 98:7-99:3.

After considering Va. Code § 20-124.3's factors, the Court finds that it is in J.E.B.'s best interests for Mr. Boardwine and Ms. Bruce to share legal custody. In addition, because J.E.B. is thriving in Ms. Bruce's physical custody and because Mr. Boardwine has not asked for primary physical custody, the Court finds that Ms. Bruce and Mr. Boardwine shall share joint physical custody, but Ms. Bruce shall have primary physical custody of J.E.B. Finally, the Court finds that Mr. Boardwine is entitled to reasonable and liberal visitation. The parties should either agree on an appropriate visitation schedule or set a hearing on that issue.

*Conclusion*

Because Va. Code § 20-158 does not apply, Mr. Boardwine may establish paternity under Va. Code § 20-49.1. He carried his burden on this issue, providing sufficient genetic testing to establish paternity. Accordingly, he is J.E.B.'s legal father.

Even if Va. Code § 20-158 did apply, however, it would not have prevented Mr. Boardwine from establishing paternity.

Finally, Mr. Boardwine is entitled to share joint legal and physical custody with Ms. Bruce. Ms. Bruce shall have primary physical custody, and Mr. Boardwine is entitled to reasonable and liberal visitation.